CAHILL GORDON & REINDEL LLP SAMSON
A. ENZER (*PHV Pending*)
senzer@cahill.com
HERBERT S. WASHER (*PHV Pending*)
hwasher@cahill.com
EDWARD N. MOSS (*PHV Pending*)
emoss@cahill.com
JOHN S. MACGREGOR - # 304330
jmacgregor@cahill.com
32 Old Slip
New York, NY 10005
Telephone:    212 701 3000
Facsimile:    212 269 5420

CAHILL GORDON & REINDEL LLP
GREGORY STRONG (*PHV Pending*)
gstrong@cahill.com
221 W. 10th Street, 3rd Floor
Wilmington, DE 19801
Telephone:    302 884 0001

KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
STEVEN P. RAGLAND - # 221076
sragland@keker.com
BROOK DOOLEY - # 230423
bdooley@keker.com
GAYATRI V. PARANJAPE - # 345933
gparanjape@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiffs YUCHEN "JUSTIN" SUN,
BLUE ANTHEM LIMITED, and BLACK
ANTHEM LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YUCHEN "JUSTIN" SUN; BLUE ANTHEM LIMITED; and BLACK ANTHEM LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> WORLD LIBERTY FINANCIAL LLC (f/k/a WORLD LIBERTY FINANCIAL, INC.), <br><br> Defendant. | Case No. <br><br> **COMPLAINT** <br><br> Judge: <br><br> Date Filed: April 21, 2026 <br><br> Trial Date: None set |

COMPLAINT
Case No.

Plaintiffs Yuchen "Justin" Sun ("Mr. Sun"), Blue Anthem Limited ("Blue Anthem"), and Black Anthem Limited ("Black Anthem"; and together with Blue Anthem, the "Sun Companies") (collectively, "Plaintiffs"), by and through their attorneys at Cahill Gordon & Reindel LLP and Keker Van Nest & Peters LLP, bring this action against Defendant World Liberty Financial LLC (f/k/a World Liberty Financial, Inc.) ("World Liberty"), alleging as follows:

## NATURE OF THE CASE

1.     Plaintiffs, Mr. Sun and the Sun Companies, bring this lawsuit to hold World Liberty accountable for engaging in an illegal scheme to seize property—specifically, cryptographically secured digital $WLFI tokens, which at times have been valued at over $1 billion—that Plaintiffs lawfully purchased from World Liberty.

2.     Mr. Sun is a globally recognized entrepreneur in the crypto industry and the founder of the TRON blockchain network whose native digital TRX tokens currently have a market capitalization of over $31 billion, making them among the top ten most valuable digital assets in the world.

3.     Mr. Sun has long been (and remains) an ardent supporter of President Trump and the Trump family and was approached by the Trump-backed World Liberty crypto project for startup capital when the project launched in 2024.  At that pivotal time for World Liberty, Mr. Sun invested $45 million to purchase $WLFI tokens from World Liberty not only because of the project's claims that it would promote adoption of decentralized finance—an issue Mr. Sun cares deeply about and to which he has devoted much of his life's work—but also because of the Trump family's association with the project.

4.     But as Mr. Sun unfortunately has learned, World Liberty's operators, including Chase Herro, see the project as a golden opportunity to leverage the Trump brand to profit through fraud.  Even though Mr. Sun was one of World Liberty's anchor investors and biggest supporters, that did not stop Mr. Herro and the company's other principals from making Mr. Sun a prime target of their fraudulent scheme.  As explained in detail below, World Liberty's fraud has caused Mr. Sun and his companies to incur hundreds of millions of dollars in damages, and they seek to be compensated—and also seek certain narrow equitable relief—through this lawsuit.

1

COMPLAINT
Case No.

5.  Founded in 2024, World Liberty is a company in the "cryptocurrency" space that claims to provide its users with broad access to "decentralized" finance (known as "DeFi") in order to free them from the control of "centralized" intermediaries such as government-chartered banks and other middlemen that may interfere with users' ability to transfer or exchange assets. While "centralized" finance ("CeFi") relies on intermediaries such as banks or exchanges to manage assets and implement transactions, DeFi allows direct transactions through computer software known as virtual "smart contracts" deployed on a blockchain network.  As the World Liberty CEO put it, DeFi companies like World Liberty free users from "the big boogeyman behind the curtain."  Importantly, according to World Liberty's public statements, its token project claimed that it would have no "centralize[d] control and surveillance," and that users would operate in a world where "no one's ever going to tell you that your account is shut down," and "no one's ever going to tell you who and why and what money you can send."

6.  In October 2024, World Liberty began trying to sell $WLFI tokens to raise startup capital for the purported purpose of developing DeFi products, technology, and tools to empower its users with the freedom to transact without financial intermediaries.  The tokens were marketed as "governance" tokens—meaning they would give holders only the ability to vote on governance proposals relating to the tokens—in an effort to avoid registration requirements under federal and state laws.  World Liberty explained that the tokens were not tradable at the time it was selling them.  Yet despite the boilerplate disclaimers, the reality was that users would not spend significant sums of money—World Liberty initially aimed to raise $300 million—to acquire digital assets that had no economic upside.

7.  Initially, $WLFI tokens faced lackluster demand.  World Liberty sold only $12 million worth of tokens after 24 hours, and only $22 million worth in the first month.  However, that all changed when Mr. Sun came onto the scene.  In November 2024, Mr. Sun made a decisive anchor investment of $30 million for the purchase of two billion $WLFI tokens from World Liberty, and purchased an additional one billion tokens for $15 million more in January 2025, bringing his total investments to $45 million.  As a sweetener for making these investments, World Liberty appointed Mr. Sun as an advisor to the World Liberty project and

2

COMPLAINT
Case No.

awarded him a grant of an additional one billion $WLFI tokens as compensation for the role. After Mr. Sun's blockbuster investments—a public vote of confidence from one of the leading crypto entrepreneurs in the world—World Liberty took off.  To date, World Liberty has raised approximately $550 million through $WLFI token sales, a 2,400% increase since Mr. Sun lent his name and credibility to the project.

8.    Mr. Sun's initial $WLFI token purchase was governed by a November 25, 2024 Token Purchase Agreement ("TPA") with World Liberty.  That contract contained representations by World Liberty making clear that (i) World Liberty would have no centralized authority over $WLFI tokens; and (ii) the tokens were expected to become tradable in the future. As for the former, World Liberty expressly represented in the TPA that through Mr. Sun's investment, Mr. Sun would "acquire valid marketable title to the Purchased Tokens, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest[.]"  There can be no serious dispute that *marketable* means easily and immediately sellable, and that *free and clear of any encumbrance* guarantees a buyer clear, unburdened title without any hidden claims or third-party rights.  As for the latter, the TPA provided the tokens were not "currently" transferable and could not be resold "until such time where Token holders elect to enable transferability in the future through governance votes."  In other words, the tokens would become transferable—and Mr. Sun would not be paying tens of millions of dollars for assets that would never have any economic value—once token holders vote in the future to make them tradable (which they, of course, would have every economic incentive to do).

9.    World Liberty's promises and representations, however, were false and misleading.  Far from freeing its users of centralized control, World Liberty positioned itself as *the new boogeyman behind the curtain*.  Indeed, World Liberty secretly installed powers that have enabled it to freeze Mr. Sun's tokens such that—even though they became tradable on September 1, 2025, on secondary market digital asset trading exchanges—he has not been able to sell a single one to date.  Perhaps even worse, World Liberty has seized the power to permanently and irrevocably "burn" Mr. Sun's tokens even while they sit in his own digital wallet, something World Liberty's principals have threatened Mr. Sun they will do if he seeks to vindicate his legal

3

COMPLAINT
Case No.

rights. In other words, World Liberty has not only deprived Mr. Sun of the right to sell his property, but they have also threatened to destroy that property altogether.

10. World Liberty's misconduct first came to the surface in the summer of 2025. In July 2025, $WLFI token holders voted to approve a governance proposal to make a portion of their tokens—all of which had been previously locked—transferable. In August, shortly before the first tranche of $WLFI tokens was set to become tradable in September, Plaintiffs learned that World Liberty secretly had changed the company-controlled $WLFI smart contract used to deploy the tokens in a way that gave World Liberty a brand-new "blacklisting" power enabling it to restrict the transfer of users' tokens. There was no governance proposal (let alone a vote of token holders) on whether World Liberty should have this power, nor did World Liberty announce to token holders what the company was doing. World Liberty simply took the power for itself.

11. Separate and apart from those secret "blacklisting" powers, World Liberty also applied special transfer restrictions on Mr. Sun's tokens and leveraged them to extract additional concessions from Mr. Sun ahead of the September unlock of a portion of investors' tokens. In the months preceding World Liberty's power grab, its principals had been trying to pressure Mr. Sun to increase his investment in the company's products. In addition to $WLFI, World Liberty also marketed a "stablecoin," a token that the company claimed would be backed on a 1:1 ratio by U.S. dollars. But World Liberty's stablecoin, called USD1, had faced underwhelming retail demand. As a result, World Liberty's principals had been trying to convince Mr. Sun to "mint" USD1—in other words, to create USD1 by purchasing it with a corresponding number of U.S. dollars—and promote it for use on the blockchain that Mr. Sun developed, namely TRON (one of the largest decentralized blockchain-based operating systems in the world). By August 2025, Mr. Sun had not yet agreed to provide capital for minting USD1. To ratchet up the pressure, World Liberty imposed special restrictions on the transferability of Mr. Sun's tokens ahead of the September unlock.

12. In August 2025, Mr. Sun learned that World Liberty had used such restrictions to freeze his tokens, meaning that he would be prevented from receiving or transferring them—even

COMPLAINT
Case No.

between digital wallets he controlled—and would not be able to sell any when they became tradable on September 1.  World Liberty had no justification for assuming the power to restrict users' tokens, which it represented it would never have, or for singling Mr. Sun out and restricting his $WLFI tokens without any legitimate justification. ██████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ ████████████████████████████ ████████████████████████ ████████████████████ For a brief period, World Liberty unlocked 20% of the three billion $WLFI tokens Mr. Sun purchased.

13.     Just days later, however, World Liberty went back on its promises yet again and blacklisted the crypto wallet address that held Mr. Sun's unlocked $WLFI tokens, freezing those tokens once more.  When Mr. Sun protested, World Liberty offered a host of pretextual excuses—for example, they implausibly blamed Mr. Sun for the 40% price drop $WLFI had experienced on September 1, the first day of token trading—that are demonstrably false.  World Liberty also threatened to burn Mr. Sun's tokens and report him to U.S. criminal authorities if he tried to vindicate his rights (a pressure tactic that itself qualifies as criminal extortion).  Moreover, when Mr. Sun's address was blacklisted and his $WLFI tokens were frozen by World Liberty, he was no longer able to participate in governance votes with any of the three billion tokens he had purchased.  And then, on September 5, 2025, to add insult to (hundreds of millions of dollars of) injury, World Liberty published a post on the social media platform X.com (formerly Twitter.com) insinuating that the company suspected Mr. Sun of "misappropriation of other holders' funds"—a false and defamatory claim that World Liberty has never proven.

14.     Over the last several months, World Liberty has continued to take away its users' rights.  For example, in November 2025, World Liberty implemented another change to the smart contract—again, unilaterally and without any governance vote or disclosure to $WLFI holders— giving itself the power to reallocate $WLFI tokens from any user to another.  As another

example, on April 15, 2026, World Liberty published a governance proposal that would result in the burning of 100 million of Mr. Sun's tokens or the indefinite lockup of those tokens forever. Mr. Sun does not have the ability to vote on that proposal because World Liberty is currently denying him that right. These actions demonstrate the extent of World Liberty's centralized control over what it marketed as a DeFi platform.

15. World Liberty has the power to seize and burn Mr. Sun's tokens—as it has threatened to do—at will. Although World Liberty previously agreed not to burn those tokens while the parties were in talks to resolve their disputes, those discussions have broken down, and World Liberty made clear in a public statement posted on X.com on April 12 that it has no intention of making a deal with Mr. Sun. Plaintiffs thus have no assurance that World Liberty will refrain from making good on its threat to burn their tokens, which it has the technical capability to do at any time.

16. World Liberty could also use its unchecked powers to encumber or dissipate its assets in a way that would irreparably harm Mr. Sun. As discussed in detail below, World Liberty appears to be in financial distress, and it recently pledged hundreds of millions of $WLFI tokens as collateral for a loan. World Liberty's power to "reallocate" Mr. Sun's tokens means it could pledge Mr. Sun's property to obtain a loan for itself at any time. Thus, World Liberty may well not have the resources to pay Mr. Sun the hundreds of millions of dollars he is owed—and seeks through this lawsuit.

17. Mr. Sun and the Sun Companies bring this action to remedy World Liberty's egregious misconduct, including their breaches of contract, fraud, and conversion, and to stop World Liberty from continuing to trample on Plaintiffs' rights.

## PARTIES

18. Plaintiff Yuchen "Justin" Sun is a globally recognized entrepreneur and thought leader in the crypto industry. Among other things, Mr. Sun is the founder of the TRON blockchain network—one of the largest decentralized blockchain-based operating systems in the world. TRON's native digital governance tokens (called TRX) currently have a market

capitalization of over $31 billion, making them one of the top ten most valuable digital assets in the world.  Mr. Sun is a citizen of St. Kitts and Nevis and a resident of Hong Kong.

19.     Plaintiffs Blue Anthem and Black Anthem are both British Virgin Islands companies limited by shares (entities analogous to corporations and treated as such for purposes of federal diversity jurisdiction), with registered addresses in the British Virgin Islands.  Both have their principal places of business in the British Virgin Islands and are wholly owned by Mr. Sun.

20.     Defendant World Liberty Financial LLC is a Florida limited liability company.  According to Florida state records, its sole managing member is Scott Alper, an individual domiciled in New York.  Upon information and belief, World Liberty does not have any other members whose citizenship would defeat diversity jurisdiction.  Accordingly, World Liberty Financial is a citizen of New York.

### JURISDICTION AND VENUE

21.     This dispute arises from the parties' November 25, 2024 TPA, the contract that governed Plaintiffs' initial $30 million purchase of $WLFI tokens from World Liberty.

22.     The TPA expressly provides that the parties must file suit in California (and, if in federal court, in the Northern District of California) for the purpose of resolving any and all disputes "arising out of or based upon" the TPA, that World Liberty irrevocably and unconditionally submits to the jurisdiction of this Court, and that World Liberty waives any right to challenge jurisdiction or venue in this Court (and agrees not to assert any such challenge):

> The Parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of California and to the jurisdiction of the United States District Court for the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon these Terms, (b) agree not to commence any suit, action or other proceeding arising out of or based upon these Terms except in the state courts of California or the United States District Court for the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that these Terms or the subject matter hereof may not be enforced in or by such court.

> Each Party consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the Northern District of California or any court of the State of California having subject matter jurisdiction.[1]

23.    While the TPA provides for a choice of California state court versus this federal Court, the latter is appropriate because there is diversity jurisdiction under 28 U.S.C. § 1332. There is complete diversity between Plaintiffs and Defendant, and the amount in controversy exceeds $75,000. This action is properly filed in the Northern District of California pursuant to the parties' agreement, which permits filing in any division within this District.

## STATEMENT OF FACTS

### A.    World Liberty.

24.    World Liberty was founded in 2024.  From the beginning, World Liberty touted the "decentralized" nature of its platform, claiming that users would be free to transact without interference from any centralized authority.  For example, in its marketing materials, World Liberty claimed it would develop DeFi software applications and launch digital $WLFI tokens to promote the public's "freedom to transact" and bring the benefits of DeFi to mainstream Americans.

25.    "DeFi" is an umbrella term that describes a broad range of financial services (including trading, lending, and borrowing) that are facilitated through automated software running on decentralized public blockchain networks rather than by centralized financial intermediaries like government-chartered banks.  Anyone with internet access and crypto asset wallet software can have access to financial services on a DeFi platform.  Unlike CeFi—which relies on intermediaries such as banks or exchanges to manage assets and implement transactions—access to DeFi tools and platforms does not require permission from any centralized decision-makers in any government or bank.  Thus, DeFi users should face no risk that a centralized intermediary will interfere with their ability to transfer their own assets.

---

[1] The TPA further provides that "[t]hese Terms will be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to conflict of law rules or principles (whether of Delaware or any other jurisdiction) that would cause the application of the laws of any other jurisdiction."

8

**B.    World Liberty Began Selling $WLFI Tokens To Raise Capital.**

26.    In October 2024, World Liberty launched and began selling digital $WLFI tokens to raise startup capital, targeting a raise of $300 million.  In its disclosures, World Liberty claimed that the tokens were not investments, but rather would provide only "governance" rights—giving token holders the right to vote on governance proposals regarding the $WLFI tokens and related protocols.

27.    While World Liberty included these disclaimers to avoid application of federal law governing the offering of securities, the commercial realities of World Liberty's token sales belie that boilerplate.[2]  Although the tokens were nontransferable, or "locked," when they were initially sold, World Liberty led investors to believe the tokens would eventually be unlocked and traded. For instance, the TPA acknowledged that token transferability could be "unlocked in the future through protocol governance procedures" and warned about eventual investment risks, such as a lack of "market liquidity" and "extreme volatility" in token value.  These risk disclosures made clear what everybody who purchased the tokens in exchange for real-world dollars knew all along—the tokens were expected to become tradable.  Indeed, it would make no sense for members of the public to pay any money for the tokens—let alone tens of millions of dollars like Plaintiffs did—if the tokens offered no economic upside.[3]

28.    Initially, World Liberty fell well short of its targeted capital raise of $300 million. Within 24 hours of launching sales in October 2024, World Liberty had sold only $12 million worth of tokens.  After that disappointing start, World Liberty filed a Form D with the Securities and Exchange Commission ("SEC") on October 30, 2024, reducing the company's fundraising

---

[2] In fact, recognizing the risk that World Liberty's capital-raising sales of $WLFI tokens could qualify as an unregistered securities offering, World Liberty purported to sell tokens pursuant to the securities registration exemptions in (i) SEC Regulation D for accredited U.S. investors and (ii) SEC Regulation S for qualified foreign investors.

[3] Moreover, it was clear that any economic upside would be the result of the tokens' increasing in value.  World Liberty made clear that the tokens did not "represent or confer any ownership right or stake, share or security or equivalent rights, or any right to receive any distribution, revenue share, additional tokens, intellectual property rights or any other form of participation in or relating to the WLF Protocol, and/or the Company and its corporate affiliates."  Thus, the only way to make money would be from trading.

9

COMPLAINT
Case No.

target by 90%—to just $30 million.  But a month later, World Liberty had failed to reach even this much more modest goal, having sold only approximately $22 million worth of $WLFI tokens.

**C.    Mr. Sun Changed World Liberty's Trajectory With Key Anchor Investments.**

29.    In November 2024, however, World Liberty's fortunes changed when Mr. Sun provided a much needed lifeline.

30.    On November 25, 2024, Mr. Sun (through his company Blue Anthem) purchased two billion $WLFI tokens from World Liberty for $30 million.  That same day, World Liberty named Mr. Sun an "advisor" to World Liberty, and awarded Blue Anthem an additional allotment of one billion $WLFI tokens to compensate Mr. Sun for his advisory role.  In response to this development, World Liberty posted on X.com that it was "honored" to have the support of Mr. Sun.  In January 2025, Mr. Sun (again via Blue Anthem) purchased an additional one billion $WLFI tokens from World Liberty for $15 million, bringing Plaintiffs' total $WLFI holdings up to four billion tokens (three billion from Blue Anthem's investments totaling $45 million, and one billion from the advisor award).

31.    Mr. Sun's investments changed World Liberty's fortunes.  As reported by *CoinDesk* in February 2025:

> World Liberty Financial, the Donald Trump-backed crypto project, ***owes much of its early success to Justin Sun***, the Chinese-born crypto billionaire who became an official advisor to the project after purchasing $30 million worth of its token, WLFI, said World Liberty co-founder Zak Folkman.

> Folkman remarked that, "the goal of the project is being able to create progress to actually merge traditional financial institutions with decentralized finance," in a panel at *CoinDesk*'s Consensus Hong Kong conference.

> For several weeks, the Trump-endorsed ***WLFI faced lackluster sales, failing to reach its $30 million fundraising target***.  The token was restricted from trading and only available to non-U.S. investors and accredited U.S. investors.

> ***The project's fortunes changed, however, when Sun stepped in***.  "This guy," Folkman said with a gesture towards Sun, "saw that regardless of the outcome, this project is a monumental move forward for the entire crypto community."

*      *      *

> Today, World Liberty Financial is known for WLFI, the governance token that it put up for sale mere days after the project was unveiled.
>
> "When we were launching this project, it was a very heated time," Folkman told the panel. "There was a lot of scrutiny on our project due to who was involved."
>
> ***After Sun's 10-figure endorsement, "everything kind of snowballed from there," said Folkman***. World Liberty not only oversold its fundraising target, but it eventually set a new one. Should it meet its new goal—which it seems poised to do soon—Folkman noted that ***WLFI will become the fourth-largest initial coin offering (ICO) of all time***.[4] [5]

32. World Liberty's praise of Mr. Sun was well-founded. World Liberty had failed to meet its already significantly reduced fundraising goal of $30 million over a month after the $WLFI tokens were launched. Since Mr. Sun's public endorsement, however, the company has raised approximately $550 million through $WLFI sales to date—a 2,400% increase.

**D.    World Liberty Induced Plaintiffs' Investments Through Fraud.**

33. World Liberty induced Plaintiffs to make their investments in World Liberty through fraudulent misrepresentations and omissions about the economic rights and liberties that would come with purchasing $WLFI tokens. World Liberty made these material misrepresentations with knowledge, or reckless disregard, of their falsity, and it knowingly or recklessly omitted material information. Plaintiffs relied on World Liberty's false representations and omissions and were damaged by that reliance.

34. World Liberty made these false and misleading statements in pre-purchase pitch conversations with Plaintiffs and in marketing materials, including in World Liberty's white paper (which the company refers to as a "gold paper," the first version of which was published on October 21, 2024). World Liberty's false and misleading statements broadly fell into three categories: (i) misrepresentations and omissions about the freedom to transact, (ii)

---

[4] Sam Kessler, *Founder of Trump's World Liberty Financial Credits Justin Sun for Project's Success*, CoinDesk (Feb. 19, 2025), https://www.coindesk.com/consensus-hong-kong-2025-coverage/2025/02/19/founder-of-trump-s-world-liberty-financial-credits-justin-sun-for-project-s-success/.

[5] Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

11

misrepresentations and omissions about token holders' governance rights, and (iii) misrepresentations and omissions about World Liberty's compliance with the law.

35. ***Misleading representations about the freedom to transact***. World Liberty repeatedly claimed its mission was to promote the "liberty" provided by DeFi, summed up in the gold paper as "the ability to transact privately and without intermediaries." The gold paper decried the "centralized control" of "traditional financial intermediaries," lauded the "freedoms that decentralized assets provide" and the benefits of "peer-to-peer systems of transactions," and pledged to make DeFi "readily available to mainstream Americans." To those ends, the gold paper announced World Liberty's plan "to launch the World Liberty Financial Protocol ('WLF Protocol'), a US-based decentralized platform, that is intended to offer users with information about and access to certain third-party DeFi applications, based on American ideals of liberty, privacy, and freedom to transact." The gold paper thus boasted that World Liberty was "intended to be more than a decentralized finance platform" and was "committed to democratizing access to DeFi and fostering mass adoption of DeFi and cryptocurrency."

36. ***Misleading representations about token holders' governance rights***. As part of World Liberty's professed goal to "to democratize finance," the gold paper explained, "$WLFI tokens represent a right to vote on certain WLF Protocol matters." According to the gold paper, token holders could "submit proposals[,] discuss them and vote on WLF Protocol changes, marketing initiatives, new features, and more." Indeed, the gold paper noted that World Liberty was "*required* in its bylaws to defer to certain token holder votes." The gold paper further stated that the "WLF Governance Platform is community-governed through the $WLFI token" and that "World Liberty Financial governance is divided into two categories of votes," the first of which was "[a]pproved upgrades to the WLF Protocol." The gold paper thus described $WLFI as "the governance token at the heart of World Liberty." In fact, the gold paper claimed that because $WLFI tokens were initially locked from trading and conferred "no right of return or other distribution," the "*sole* utility of holding $WLFI is governance of the WLF Protocol."

37. ***Misleading representations about World Liberty's compliance with the law***. World Liberty also said it would obey the law. For example, the gold paper qualified its

statement that World Liberty was required to abide by certain token holder votes by noting that the requirement would apply only if "the voting result does not constitute or create an unreasonable risk of violating a legal requirement (including existing contractual obligations)." With respect to token tradability, the gold paper further stated that all tokens would remain locked unless and until "$WLFI are unlocked through protocol governance procedures in a fashion that does not contravene applicable law."

38.     World Liberty continued to tell lies about all three topics after inducing Plaintiffs to invest in the company.  Notably, the November 2024 TPA reiterated that World Liberty would operate in the "DeFi space" and that "the WLF Protocol" would be a "DeFi protocol[.]"  The TPA further stated that "[t]he sole utility of holding $WLFI is governance"; that token holders would "have the power to propose and vote on proposals that will help to shape the future of the World Liberty Financial Protocol," including "decisions on marketing initiatives, future functionality, and more"; and that "[a]ll $WLFI" would "have equal voting power within the WLF Protocol."  And the TPA stated that "[i]f transferability of $WLFI is sought to be unlocked in the future through protocol governance procedures, such unlock would only be permitted if determined not to contravene applicable law," and that "[t]o [World Liberty's] knowledge, [World Liberty's] sale of Tokens complies with all applicable laws and regulations in [World Liberty's] jurisdiction, and the law and regulation of any jurisdiction to which [World Liberty] may be subject."

39.     The TPA also carried forward to today the false and misleading statements that World Liberty made in the gold paper and the TPA itself.  The TPA contained representations that Blue Anthem "ha[s] read and understand[s] these Terms and the other available WLF Protocol Terms and Policies (including the White Paper)"—i.e., the gold paper—and that Blue Anthem has "obtained sufficient information about the Tokens to make an informed decision to purchase and use the Tokens and ask any questions, provided that, unless otherwise waived by [Blue Anthem] in writing, all information given by [World Liberty] remains true, complete, accurate and non-misleading as of the Effective Date and throughout the date on which all Purchased Tokens are unlocked."  As billions of Plaintiffs' tokens have never been unlocked, this

bring-down clause means World Liberty's false statements in the gold paper and the TPA continue to this day.

40.     Finally, World Liberty continued to spread its false narratives in post-purchase public statements.  For example, during an August 2025 appearance on Fox News, World Liberty's CEO claimed that World Liberty was "trying to democratize the financial system" and "put power back in the hands of the people," instead of "the big boogeyman behind the curtain." Similarly, during an August 2025 appearance on the *WuBlockchain* podcast, World Liberty's CEO claimed that the "genesis of World Liberty" was seeing his friends get "de-banked" and "de-platformed" by traditional financial institutions—an experience he said caused him to want a "democratized system" where "no one's ever going to tell you that your account is shut down," and "no one's ever going to tell you who and why and what money you can send."

41.     All of these statements were materially false or misleading.

42.     World Liberty's statements about freedom to transact were false and misleading. As described below (*see* ¶¶ 58-68, 78-79, 94-103), the company gave itself sweeping centralized control over its platform and $WLFI tokens, which it has used to freeze Plaintiffs' tokens twice and threatened to use to destroy those tokens by burning them.

43.     World Liberty's statements about token holders' governance rights were false and misleading.  As described below (*see* ¶¶ 61, 79, 103), World Liberty disenfranchised Plaintiffs by disabling the governance function of three billion of their tokens, and the company changed its online protocol by implementing two smart contract upgrades—to the severe detriment of token holders—without making a governance proposal, holding a governance vote, or even giving token holders any notice.

44.     World Liberty's statements about compliance with the law were likewise false. When World Liberty eventually did unlock a portion of $WLFI tokens for trading pursuant to a governance vote, the company did so in a manner that posed an "unreasonable risk of violating" legal requirements and almost certainly "contravene[d] applicable law."  Under the Bank Secrecy Act and regulations promulgated thereunder by the Financial Crimes Enforcement Network ("FinCEN"), an administrator of convertible virtual currency must register with FinCEN as a

money services business and comply with the Bank Secrecy Act's anti-money laundering requirements for money service businesses (as well as federal and state money transmitter laws).[6] An administrator of convertible virtual currency is an entity that puts a convertible virtual currency into circulation and has the power to redeem it.  In addition, an administrator exercises control over the convertible virtual currency in a way that constitutes money transmission and triggers obligations to register with FinCEN as a money services business and comply with the Bank Secrecy Act.

45.    In this case, World Liberty caused $WLFI tokens to be issued; sold those tokens to purchasers; and, as described below (*see* ¶¶ 61, 103), thereafter unilaterally changed the $WLFI token code so the company can: (i) blacklist addresses and freeze $WLFI tokens, and (ii) reallocate $WLFI tokens from one address to another.  World Liberty's sweeping centralized control over $WLFI tokens—besides being the antithesis of DeFi—makes it hard to deny that World Liberty is acting as an unregistered and unlicensed money transmitter in violation of various federal and state criminal laws.[7]

46.    World Liberty thus induced Plaintiffs to invest in the company through a series of false or misleading statements or omissions about its commitment to DeFi principles and supposedly decentralized platform, the governance rights that would attach to token ownership, and World Liberty's intent to follow the law.  All of these points were material.  In deciding whether to invest in World Liberty, any reasonable investor would have wanted to know that a purportedly DeFi company would develop blacklisting and reallocation powers allowing it to freeze and destroy user tokens, without even allowing token holders to weigh in via a governance vote.  That is especially so given that the existence of such centralized control over $WLFI tokens very likely violates the law.

47.    And, although the TPA states that (1) the tokens were not "currently" transferable; (2) the tokens could not be resold "until such time where Token holders elect to enable

---

[6] *See* FinCEN Guidance No. FIN-2013-G001, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, at 1-5 (Mar. 18, 2013), https://www.fincen.gov/system/files/shared/FIN-2013-G001.pdf.

[7] *See*, *e.g.*, 18 U.S.C. § 1960; 31 U.S.C. §§ 5318, 5322.

15

COMPLAINT
Case No.

transferability in the future through governance votes"; and (3) token holders should not purchase tokens with the expectation that the tokens would become tradable, the TPA acknowledges that the tokens could become transferable in the future, and never states (or even suggests) that should that occur, World Liberty would (or would have the ability to) exercise a secret blacklisting power that could freeze user tokens and prevent their transfer, even between digital wallets controlled by the same token holder—information any reasonable investor would find material.

48.     World Liberty made these misrepresentations and omissions with knowledge of their false and misleading nature or at least reckless disregard as to the truth.  The company's own actions prove that point.  As described below (*see* ¶¶ 61, 64-68, 75-78, 103), World Liberty did not hesitate to upgrade the $WLFI smart contract to add the blacklisting and reallocation functions or weaponize those powers against Plaintiffs when it suited the company's purposes.

49.     World Liberty also plainly intended for Plaintiffs to rely on its misstatements and omissions, which Plaintiffs justifiably did.  If World Liberty had revealed the possibility that it would develop and use secret blacklisting powers against them and violate the law, Plaintiffs would never have given any money to the company, let alone the $45 million Plaintiffs invested between November 2024 and January 2025.

**E.     World Liberty's Campaign To Extract Additional Capital From Mr. Sun.**

50.     In the spring and summer of 2025, World Liberty and its principals engaged in a sustained and escalating campaign to pressure Mr. Sun into committing hundreds of millions of dollars to mint USD1, World Liberty's stablecoin.  This campaign reveals that World Liberty decided to freeze Mr. Sun's $WLFI tokens in retaliation for his refusal to capitulate to their demands.

51.     During the period from approximately April through July 2025, World Liberty principals repeatedly contacted and pressured Mr. Sun to invest additional capital, including by pressuring him at public events to commit to minting $200 million in USD1 and separately attempting to extract an equity investment in World Liberty's holding company.  Mr. Sun's polite and noncommittal responses at these social events were treated by World Liberty as binding commitments.

COMPLAINT
Case No.

52.    By July 2025, when it became clear that Mr. Sun would not invest or mint USD1 on their terms, World Liberty principals became hostile toward Mr. Sun.

**F.    World Liberty Improperly Froze Plaintiffs' $WLFI Tokens.**

53.    On July 9, 2025, World Liberty opened a week-long voting period for $WLFI token holders to approve a company governance proposal to make a portion of their tokens—all of which had been previously locked—transferable.

54.    The governance proposal clearly stated that the vote was intended to "formally initiate the tradability of the token[s]," and that, if enacted, the proposal would:

- "Make $WLFI tradable, thereby enabling broader community access to governance participation, whether through peer to peer transactions or secondary markets";

- "Transition the WLFI ecosystem from closed to open participation";

- "Enable greater token utility access";

- Make a "portion" of tokens "sold to early supporters"—like Plaintiffs—"eligible to be unlocked upon launch of tradability";

- Enable World Liberty to "[p]roceed with WLFI tradability," rather than "[m]aintain[ing] current token non-tradability and closed network status"; and

- "Launch[] WLFI as a tradable token [and] bring[] us one step closer to building a more open, transparent, and powerful financial system."

55.    Although the July 9, 2025 proposal vaguely stated that "any eligibility requirements for unlock [would] be determined subsequently," the proposal did not mention that investors would need to sign a "token unlock agreement" to access their tokens. Nor did it mention that World Liberty would grant itself the authority to prevent investors from accessing their tokens.

56.    The governance vote ended in approval on July 16, 2025.

57.    In an X.com post on August 22, 2025, World Liberty set forth its plan to implement the result of the vote, announcing that the "WLFI token is becoming tradable & transferable. This thread is your exact guide: what's happening, when it happens, and what to do—no guesswork." The post further explained that (1) the company would unlock tradability for 20% of the $WLFI tokens sold to early purchasers (like Mr. Sun and the Sun Companies),

17

subject to an unlock schedule; (2) the remaining 80% of the $WLFI tokens sold to early supporters would be subject to a second vote to determine their unlock and release schedule; and (3) tokens awarded to founders and advisors would remain subject to a longer unlock schedule.

58. In addition, the August 22, 2025 X.com post stated for the first time that token holders would have to agree to additional terms imposed by World Liberty to have their tokens unlocked. In a statement about "[e]ligibility," the post stated that "[o]nly persons that affirmatively make required certifications and accept and agree to the unlock agreement and terms and conditions will be eligible for unlock."

59. The agreement referenced in the post was the "WLFI Token Unlock Agreement," which was initially published on World Liberty's website on or about August 25, 2025. Among other things, that agreement revealed for the very first time that World Liberty would have the power to selectively freeze users' tokens. Specifically, the agreement provided in Section 6 that World Liberty may, "in its sole discretion, decline to unlock, restrict access to, or freeze any wallet if it determines that such action is necessary to comply with applicable law, enforce its policies, or protect the integrity of the WLF Protocol."

60. These conditions were not included in the TPA, the gold paper, marketing materials, or the governance proposal, and the WLFI Token Unlock Agreement was the first time World Liberty publicly purported to have these powers—none of which Plaintiffs agreed to when purchasing their tokens. In other words, World Liberty collected investors' money on the promise of giving them tokens and only afterward announced that investors would need to agree to give World Liberty sweeping blacklisting and freezing powers as a condition to unlocking their tokens.

61. Indeed, the original iteration of the smart contract used to deploy the tokens had no freezing function. But on August 24, 2025, right around the time World Liberty first posted the WLFI Token Unlock Agreement on its website, the company implemented a change to the $WLFI smart contract allowing World Liberty as the owner of the contract and two wallet addresses it designated to unilaterally blacklist any blockchain address and thereby freeze the $WLFI tokens held by a user at that address. World Liberty had repeatedly stated in the gold

paper that the WLF Protocol would be a "decentralized platform" and that "[a]pproved upgrades to the WLF Protocol" would be one of the "two categories of votes" in which $WLFI token holders would participate through the company's governance platform.  Yet World Liberty implemented this change—which gave the company unilateral token-freezing power—without any announcement or disclosure to token holders, without any public FAQ or discussion, and without any governance proposal or vote by token holders.  While the upgrade is technically visible on the public blockchain, World Liberty buried it in the code without alerting token holders to its existence or implications.  In the dark of night, the company thus created a "blacklisting" function that it could wield at will.

62.     No reasonable token purchaser would have suspected World Liberty would give itself such powers, given World Liberty's professed embrace of DeFi and rejection of centralized control. And, given World Liberty's statements in the gold paper and TPA that it would comply with the law, no reasonable token purchaser would have suspected that World Liberty would put itself at odds with criminal money transmitter laws and Bank Secrecy Act requirements by giving itself centralized blacklisting powers over users' $WLFI tokens.

63.     Meanwhile, World Liberty publicly represented that $WLFI token holders could claim their tokens starting on September 1, 2025, after connecting their wallets to the company's vesting smart contract and signing the WLFI Token Unlock Agreement.  Users would then be "free to trade your $WLFI or keep holding, the choice is yours."

64.     Because three billion of Plaintiffs' tokens were covered by the governance vote, 20% of them (or 600 million tokens) should have been unlocked for trading on September 1, 2025.   Just days before that date, however, Plaintiffs discovered that World Liberty had imposed special restrictions on their tokens under which Plaintiffs would not be able to transfer or sell any of the tokens they had purchased (even between wallets they controlled) unless and until World Liberty let them do so.

65.     Through a subsequent investigation, Plaintiffs learned that World Liberty had placed addresses holding $WLFI tokens into at least 19 categories subject to varying restrictions. The first category—applicable to approximately 86,000 early investors, but excluding Plaintiffs

19

COMPLAINT
Case No.

(which, as noted, were early investors)—allowed 20% of the holders' tokens to be unlocked and become freely tradable.  The second category—applicable to approximately 40 World Liberty founders and advisors, but again excluding Plaintiffs (even though Mr. Sun, as noted, is also an advisor)—was subject to a longer unlocking schedule to be determined by a future token holder vote.  The third category—applicable *only* to Plaintiffs—was subject to a total freeze on transfers or trading, with no contemplated vote to set an unlocking schedule.

66.    World Liberty gave no indication that such action was "necessary" to "comply with applicable law, enforce [World Liberty's] policies, or protect the integrity of the WLF Protocol"—the only circumstances in which World Liberty was permitted to freeze tokens under the terms set forth in its own WLFI Token Unlock Agreement.  In fact, World Liberty gave Plaintiffs no explanation at all.

67.    Nor did World Liberty give Plaintiffs any warning.  World Liberty never disclosed that it would treat similarly situated token holders differently—an action at complete odds with the core tenets of DeFi and the governance proposal, which stated that a "portion of [$WLFI tokens sold to early supporters] will be eligible to be unlocked upon launch of tradability," and the "remainder of the tokens will be subject to a second vote by the community to determine the unlock and release schedule," without ever stating—or even suggesting—that similarly situated token holders would be treated differently.

68.    World Liberty's actions also breached the TPA, which stated that Plaintiffs would "acquire valid marketable title to the Purchased Tokens, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest."  World Liberty's arbitrary decision to exclude Plaintiffs' tokens from tradability made Plaintiffs' "marketable title" a dead letter.

69.    Moreover, as noted, the TPA contained a bring-down provision stating that "all information given by [World Liberty] remains true, complete, accurate and non-misleading as of the Effective Date and throughout the date on which all Purchased Tokens are unlocked."  World Liberty thus represented that the claims it made in inducing Plaintiffs' initial token purchase— including the company's claims that Plaintiffs would "acquire valid marketable title to the Purchased Tokens"—continued to be true through the date the tokens were unlocked.  Yet World

20
COMPLAINT<br>Case No.

Liberty reneged on that promise even before *any* $WLFI tokens—belonging to Plaintiffs or anyone else—were unlocked for trading.

**G.    World Liberty Extorted Plaintiffs** ███████████████

70.    Promptly upon learning that World Liberty arbitrarily excluded them from trading any of their tokens, and shortly before the September 1 unlock date, Plaintiffs brought their concerns to World Liberty's attention. But rather than doing the right thing by unlocking Plaintiffs' tokens (as required by the results of the governance vote), World Liberty instead chose to leverage its unlawful restriction on Plaintiffs' property rights as a bargaining chip to extort Mr. Sun into providing additional capital for World Liberty. ███████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

71.    █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

72.    ██████████████████████████████████████████████████████████████████████████

73.    Among other things, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ As noted, Section 6 of the WLFI Token Unlock Agreement provided that World Liberty could "decline to unlock, restrict access to, or freeze any wallet if it determines that such action is necessary to comply with

applicable law, enforce its policies, or protect the integrity of the WLF Protocol." ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

74.   ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

**H.      World Liberty Illegally Refroze Plaintiffs' $WLFI Tokens.**

75.      On September 1, 2025, World Liberty unlocked 20% of all $WLFI tokens not subject to the founder, advisor, or other restrictions detailed above.  Shortly after trading in the tokens began—and through no fault of Plaintiffs—the market price of the tokens dropped by approximately 40%.

76.      After the price decline, Plaintiffs transferred a small fraction of their $WLFI token holdings—roughly 56 million tokens, worth approximately $9 million at the time—between digital wallets they controlled, ███████████████████████████████

77. ███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████

78. Notwithstanding this easily verifiable fact, on September 4, 2025, World Liberty blacklisted Plaintiffs' digital wallet address and illegally refroze Plaintiffs' $WLFI tokens—██ ████████████████████████████████████████████████

79. Plaintiffs' tokens remain illegally frozen to this day. In addition, World Liberty has illegally blocked Plaintiffs from voting or staking their tokens—a process by which a holder of cryptocurrency commits their digital assets to a blockchain network to assist in the validation of transactions, receiving additional tokens as compensation in a manner analogous to earning interest on a deposit held by a traditional financial institution.

**I.   World Liberty Offered False And Pretextual Excuses For Its Misconduct.**

80. Plaintiffs made repeated efforts to try to persuade World Liberty to unfreeze their $WLFI tokens without resorting to litigation. When Plaintiffs protested World Liberty's initial seizure and subsequent re-seizure of their $WLFI tokens, World Liberty offered a series of confusing and implausible excuses—first in private discussions and subsequently in correspondence—for its misconduct.

81. For example, World Liberty claimed that Plaintiffs were responsible for the 40% decline in the price of the $WLFI tokens on September 1. That claim is false and in any event implausible. *First*, while Plaintiffs transferred a small fraction of their $WLFI tokens between digital wallets they controlled (████████████████████████), those transfers did not involve third parties, and it is thus implausible that the transfers would have (or could have) affected the spot market price of the tokens. *Second*, Plaintiffs' transfer *followed* the price decline, meaning the transfer could not have been the cause of the decline. As explained by a *CoinDesk* article that described a post on X.com by the founder of Nansen (a digital assets analytics firm), Plaintiffs' "transfer[] didn't match the timeline of WLFI's token decline" because the transfer took place "three to five hours *after* the token's steepest drop—meaning the transfer

23
COMPLAINT
Case No.

followed the crash rather than caused it."[8] *Finally*, Plaintiffs are incentivized, given their vast $WLFI holdings, not to depress the tokens' market price, making it all the more implausible that they would have deliberately (or even negligently) done anything to decrease the value of the tokens.

82.    Similarly, World Liberty claimed that it had frozen Plaintiffs' $WLFI tokens because the decrease in $WLFI's spot market price was supposedly caused by Plaintiffs' alleged short selling of perpetual futures—crypto futures contracts that, unlike traditional futures contracts, do not have an expiration date—on $WLFI tokens on a centralized digital asset trading exchange.  That claim is also false.  *First*, Plaintiffs have at all times acted in full compliance with their obligations to World Liberty ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████. Accordingly, even if Plaintiffs had taken a short position in the futures market (which they did not), ████████ ██████████████████████████████████████ ████████████████████, and it is utterly speculative that such a futures market trade would have had any impact on the underlying tokens' spot market price.

83.    World Liberty also claimed that it had frozen Plaintiffs' $WLFI tokens because World Liberty was upset that Mr. Sun had purchased $100 million in $TRUMP tokens (which were sold by a different Trump-backed project). ████████████████████████████ ████████████████████, which was pre-approved by a Trump family member who is a partner in both projects.

---

[8] Sam Reynolds, *'If They Can Do It to Sun, Who's Next?' Say Insiders as WLFI Claims Freeze Was to 'Protect Users'*, CoinDesk (Sept. 6, 2025), https://www.coindesk.com/markets/2025/09/06/if-they-can-do-it-to-sun-who-s-next-say-insiders-as-wlfi-claims-freeze-was-to-protect-users/.

24

COMPLAINT
Case No.

84. World Liberty subsequently doubled down on certain of its false excuses, such as its false accusation that Mr. Sun shorted $WLFI tokens, and added others. For instance, World Liberty claimed to have reason to believe that Mr. Sun, including through his company Blue Anthem, acted as a straw purchaser for others in violation of the TPA. To date, World Liberty has provided no evidence to substantiate this allegation.

85. World Liberty likewise asserted it had reason to believe that Mr. Sun executed prohibited transfers of $WLFI, including transfers to the crypto exchange HTX—which is one of Mr. Sun's own businesses—and later to the digital asset trading platform Binance. Yet World Liberty offered no evidence of prohibited sales or dispositions. ███████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████. Moreover, before making the transfers, Plaintiffs gave notice to World Liberty of the transfers that they planned to make.

86. Upon information and belief, this claim by World Liberty, and several other false excuses that World Liberty has advanced for its decision to freeze or refreeze Plaintiffs' $WLFI tokens—actions not authorized by any of the relevant agreements—reveal the actual, illegal, motives for World Liberty's improper seizure of their $WLFI tokens: an effort to coerce Mr. Sun into providing more capital for the benefit of the company.

87. World Liberty also had a strong financial motive for its misconduct: market manipulation. By freezing Plaintiffs' tokens, the company improperly blocked a large and prominent holder from selling and putting downward pressure on the tokens' spot market price, and thereby artificially propped up the market price of $WLFI tokens held by World Liberty founders and the company's corporate treasury.

88. Indeed, upon information and belief, Plaintiffs are not the only large investors whose $WLFI tokens have been illegally frozen by World Liberty, further undermining World Liberty's pretextual justifications for singling out Plaintiffs' tokens for a total freeze. The fact

that World Liberty has imposed similar restrictions on other significant token holders further exposes World Liberty's stated reasons for freezing Plaintiffs' tokens as mere pretext for World Liberty's actual objectives.

89.    None of the excuses World Liberty has offered to Plaintiffs for freezing or refreezing their $WLFI tokens has any merit.  All of them are false and pretextual.  ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████.

90.    Nor can World Liberty disclaim liability on other grounds.  For example, World Liberty has faulted Mr. Sun for failing to mint and promote USD1 on the TRON blockchain. ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████.

91.    World Liberty likewise cannot avoid liability based on its contractual disclaimers.  To be sure, Plaintiffs acknowledged in the TPA that $WLFI tokens conveyed governance rights only, might never become transferable, and should not be purchased "as an investment."  But that language does not bar Plaintiffs from recovering damages measured by the market value of their tokens.  Although Plaintiffs might have assumed the risk that their investments would be worthless because $WLFI tokens never became tradable, Plaintiffs did not assume the risk that World Liberty would wield an undisclosed blacklisting power to prevent their tokens from trading while other investors' tokens did.  Thus, Plaintiffs are entitled to seek damages based on the market value of the economic rights that World Liberty has wrongly denied them.

92.    Nor can World Liberty hide behind the limitation of liability clauses in the operative agreements.  While those clauses would limit liability in certain circumstances, they do not apply where there is willful misconduct—as is plainly the case here.

26

COMPLAINT
Case No.

93. The TPA exempts from its limitation of liability all claims for World Liberty's "gross negligence, fraud, or intentional, willful or reckless misconduct." ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ The TPA ████████

███ do not limit World Liberty's liability for intentionally and illegally re-freezing Plaintiffs' $WLFI tokens.

**J.    World Liberty Threatened To Burn Plaintiffs' Tokens And Report Plaintiffs To Law Enforcement.**

94. In addition to all of the meritless excuses detailed above, World Liberty made two overt threats to Plaintiffs during the parties' discussions.

95. *First*, on or about September 24, 2025, World Liberty (through Mr. Herro) threatened to burn Mr. Sun's tokens. Mr. Herro gave Plaintiffs two options.

96. The first option was for Mr. Sun to publicly post on X.com that he would like World Liberty to burn his four billion tokens for the benefit of the broader $WLFI token holder community, which stood to gain from a likely increase in the spot market price of the tokens, given the significant decrease in supply caused by the destruction of Mr. Sun's large $WLFI token holdings.

97. The second option was for unspecified members of the $WLFI token holder community to propose a governance vote to burn Mr. Sun's tokens without compensation—a vote that would likely be approved, Mr. Herro claimed, given that, at the time, the World Liberty leadership team controlled a meaningful percentage of the outstanding $WLFI tokens in circulation, and would thus be able to effectively control the outcome of any such vote.

98. Mr. Herro stated that if Mr. Sun did not agree to pursue the first option, World Liberty would pursue the second option.

99. On or about September 24, 2025—around the time Mr. Herro made this threat—the $WLFI tokens were trading at approximately $0.194 per token, meaning Mr. Sun's four billion tokens (three billion he had purchased in November 2024 and January 2025, and one

27

billion he had been awarded for his role as an advisor to World Liberty) were worth approximately $776 million.

100. Given the immense and irreparable harm the burning of Plaintiffs' tokens would cause, Plaintiffs sought and received assurances that World Liberty would not burn their tokens while the parties were trying to resolve their disputes.

101. Those assurances were eventually set forth in a December 4, 2025 standstill agreement between the parties in which World Liberty agreed that during the agreed-upon standstill period, the company "shall not burn or otherwise destroy any of [Plaintiffs]' Purchased Tokens or Advisor Tokens"—language that Plaintiffs insisted on specifically because of Mr. Herro's threats. The initial standstill period lasted until December 13, 2025, but was extended by agreement of the parties until January 12, 2026. Even after the standstill period formally expired, however, the parties continued settlement discussions until late February.

102. Recently, however, World Liberty made it clear that it was no longer interested in a settlement. In an April 12, 2026 post on X.com, World Liberty threatened to sue Mr. Sun, concluding with the words "[s]ee you in court pal." Plaintiffs are therefore greatly concerned that World Liberty will now make good on its threat to burn their tokens. Indeed, Plaintiffs fear that the very filing of this lawsuit could cause World Liberty to retaliate by burning their tokens.

103. World Liberty has ensured it has the power to carry out that threat. In November 2025, World Liberty again upgraded the smart contract that controls $WLFI—again, without a governance vote or notice to token holders—to allow World Liberty to reallocate $WLFI tokens from any user address to any other address. World Liberty could wield this power to send any or all of Plaintiffs' $WLFI to a "burn address" where the tokens would be permanently inaccessible and unusable.

104. *Second*, Mr. Herro also falsely claimed that the know-your-customer ("KYC") documentation submitted by Mr. Sun and the Sun Companies in connection with their $WLFI token purchases was inadequate (███████████████████████████████ ████████████████████████████████████████████). Mr. Herro made this claim even though one of World Liberty's co-founders (Mr. Folkman) acknowledged in writing

on December 31, 2024, that Mr. Sun's TRON blockchain network "do[es] more to combat financial crimes than any other chain I know of."

105. On September 25, 2025, Mr. Herro repeatedly threatened to report Mr. Sun to U.S. criminal authorities over these unspecified KYC issues—which Mr. Herro and World Liberty have refused to explain in anything other than the broadest terms despite repeated requests from Plaintiffs for additional information—if Mr. Sun and the Sun Companies seek to vindicate their rights to their tokens through litigation, notwithstanding the criminal prohibitions against extortion in 18 U.S.C. § 873 (which provides that "[w]hoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both"). World Liberty's threat is all the more egregious because the so-called KYC issues appear to be nothing more than a fabricated basis for attempting to manipulate Plaintiffs.

**K.    World Liberty Defamed Mr. Sun.**

106. World Liberty also attempted to justify its misdeeds to the public by falsely accusing Mr. Sun of theft.[9]

107. On September 4, 2025, Mr. Sun publicly posted on X.com that World Liberty had frozen his tokens, and respectfully implored the company to reconsider its position:

> To the World Liberty Financial[] team and the global community,
>
> As one of the early major investors in World Liberty Financial[], I have contributed not only capital but also my trust and support for the future of this project. My goal has always been to grow alongside the team and community, and to jointly build a strong and healthy WLF ecosystem.
>
> However, during the course of operations, my tokens were unreasonably frozen.
>
> As one of the early investors, I joined together with everyone—we bought in the same way, and we all deserve the same rights.

---

[9] World Liberty's defamation of Mr. Sun is a separate wrong from the other misconduct alleged herein and is described here for context only. Mr. Sun reserves the right to bring a separate action against World Liberty for its false and defamatory statements.

COMPLAINT
Case No.

I love and respect every member of this community. Tokens are sacred and inviolable—this should be the most basic value of any blockchain. It's also what makes us stronger and more fair than traditional finance.

I call on the team to respect these principles, unlock my tokens, and let's move forward together toward the success of World Liberty Financial[].

I believe that a truly great financial brand must be built on fairness, transparency, and trust—not on unilateral actions that freeze investor assets. Such measures not only violate the legitimate rights of investors, but also risk damaging broader confidence in World Liberty Financial[].

108.    The next day, following a groundswell of outrage from the public and $WLFI token holders, World Liberty publicly posted the following response:

We've heard community concerns about recent wallet blacklists. Transparency first: WLFI only intervenes to protect users, never to silence normal activity. [Flying patriotic eagle emoji].

Over the past few days, 272 wallets were blacklisted. This is a very small segment of total holders and was done solely to prevent harm while we investigate and help impacted users.

Breakdown of the 272:

- 215 (~79.0%) tied to a phishing attack—we stepped in preemptively to stop hackers from draining funds and are working with the rightful owners to secure/move assets.

- 50 (~18.4%) owners reported compromise via support; we blacklisted at their request to help protect/recover funds.

- 5 (~1.8%) flagged for high-risk exposure (security risk under review).

*- 1 (~0.4%) suspected of misappropriation of other holders' funds;* under thorough internal review.

We do not seek to blacklist anyone. We respond when alerted to malicious or high-risk activity that could harm community members. User safety > everything.

If you were affected by a phishing attempt or suspect compromise, contact us immediately via the help center on our official site or email info@worldlibertyfinancial.com (include [transaction] hashes, screenshots, and your wallet address).

What happens next:

- We'll continue working with rightful owners to verify control and secure funds.

- We'll share clear outcomes for each category once reviews conclude.

- Any broader actions impacting holders will be communicated publicly.

COMPLAINT
Case No.

Your privacy matters. Investigations focus on on-chain behavior and security signals not personal opinions or routine trading. ***We do not blacklist for normal market participation***.

Safety reminder: Only trust links and updates posted from @worldlibertyfi and our official website. Never click links sent via [direct messages] or reply-thread imposters.

Our commitment: Protect holders. Preserve market integrity. ***Zero tolerance for malicious activity***. If you have credible info, please share it. This community protects each other. [Flying patriotic eagle emoji].

We'll publish a follow-up once reviews finish with any necessary next steps.

For now, it's back to business as usual. We're rolling out the collaborations and exciting announcements we've been waiting to share. We appreciate our amazing community . . . onward. [Flying patriotic eagle emoji].

109. Given the timing and content of World Liberty's X.com post, it was readily apparent to the public that the single account supposedly flagged on suspicion of "misappropriation of other holders' funds"—as well as the post's associated assertions about "malicious activity" and conduct that was not "normal market participation"—were references to Mr. Sun.

110. Indeed, numerous X.com users reached this very conclusion:

- "$WLFI contract has both blacklist and pause functions to give us a new definition of decentralisation [laughing emoji]. Breakdown of the 272 wallets blacklisted: . . . 1 (~0.4%) ***Justin Sun, suspected of misappropriation of other holders' funds***." (September 6, 2025 post by X user @CryptoMasterCom).

- "***Justin [S]un is the one wallet misappropriating other users['] funds for the slow kids***." (September 5, 2025 post by X user @0xbeeZ).

- "***[World Liberty] blamed Justin Sun for misappropriation of funds***[.] While they are busy shorting[.] These guys are scammers[.]" (October 7, 2025 post by X user @Y2k2100).

- "$WLFI blacklisted over 250+ wallets and says ***Justin Sun was flagged and blacklisted for: 'misappropriation of other holders' funds.'***" (September 5, 2025 post by X user @TrVon).

- "1 (~0.4%) suspected of misappropriation of other holders' funds; under thorough internal review. ***I think this is [J]ustin [S]un wallet***." (September 5, 2025 post by X user @0xandyfi).

- "$WLFI controversy: 272 wallets blacklisted[.] Breakdown: . . . ***1 = misappropriation (alleged Justin Sun)***." (September 9, 2025 post by X user @VirtualBacon0x).

31

- "[World Liberty] has confirmed that one wallet is under thorough internal review after being suspected of misappropriating other holders' funds. *__The wallet in question is linked to Justin Sun__*." (September 5, 2025 post by X user @BluepostX).

- "*__Justin Sun . . . is under thorough internal review after being suspected of misappropriating other holders' funds__* and the WLFI team blacklisted [his wallet]." (September 6, 2025 post by X user @CryptoPeakX).

111. Mr. Sun has never misappropriated other holders' funds, nor is it plausible that Mr. Sun would ever have had the ability to do so, given his limited role as an investor and advisor. When World Liberty made this assertion, the company knew the assertion was false, or acted with reckless disregard as to whether the assertion was false. This public accusation, which World Liberty never mentioned in all of the excuses it made directly to Mr. Sun, is yet another example of World Liberty's pretextual justifications for unlawfully freezing Plaintiffs' $WLFI tokens.

112. As a globally recognized entrepreneur in the digital assets space—an industry rife with suspicions of fraud, misappropriation, and abuse—World Liberty's X.com post damaged Mr. Sun's business and personal reputation.

113. Mr. Sun has invested heavily in building his reputation over many years. Among other things, Mr. Sun has appeared on the cover of *Forbes* magazine, and rang the NASDAQ opening bell in July 2025 as an advisor to Tron Inc. (f/k/a SRM Entertainment, Inc.).

114. Mr. Sun's reputation is important to the success of his business ventures, so unfounded accusations of dishonesty—and criminal activity, such as "misappropriation"—against him have tangible, real-world consequences.

115. For example, the day World Liberty falsely claimed that it suspected Mr. Sun of misappropriating token holders' assets, the spot market price of TRX (the token native to the TRON blockchain founded by Mr. Sun) fell by 1%, wiping out approximately $300 million in market capitalization.

116. In addition, following World Liberty's false claim, numerous $WLFI token holders posted to a World Liberty online governance proposal forum suggesting that the company permanently blacklist Mr. Sun's digital wallets, or confiscate or burn his tokens. For example, the day World Liberty published its false claim, a commenter stated that Mr. Sun's "wallet should

be burned [fire emoji] completely through current burning mechanism and [World Liberty] should return his 45M initial investment and burn his 3B tokens immediately."

117.     Another post a few weeks later urged World Liberty to "destroy" all of Mr. Sun's tokens given Mr. Sun's supposed "violat[ion] [of] his original promise."

118.     In fact, World Liberty's baseless accusation of Mr. Sun is ironic given the checkered past of Mr. Herro, a World Liberty co-founder and one of the company's leaders.  Mr. Herro has described himself as "the Dirtbag of the Internet," and in a 2018 speech stated that regulators should "kick shitheads like me out" of the crypto industry.  Mr. Herro also bragged in 2018 that in the digital asset space, "you can literally sell sh** in a can, wrapped in piss, covered in human skin for $1 billion if the story's right—because people will buy it." [10]  Mr. Herro was literally saying it was easy to commit fraud in crypto.

119.     In 2019, Mr. Herro stated that he had been jailed at the age of 18 for selling narcotics in Wisconsin, and that he "literally fled" to California after cutting off his ankle bracelet.  Herro has numerous convictions for theft, possession of narcotics, and driving with a suspended license, and has been charged at various times with felony possession of narcotics, resisting or obstructing an officer, bail jumping, disorderly conduct, and domestic abuse.  Mr. Herro has also publicly boasted about visiting Jeffrey Epstein's "Pedophile Island" and riding in his helicopter, and when asked about Epstein's misconduct, said: "I don't judge anybody."

120.     Mr. Herro has a long history of hawking "get rich quick" schemes, including short-lived businesses in the drop shipping and affiliate marketing space.  Mr. Herro's business misconduct was so egregious that in or around 2010, spurned customers and partners started a website called "ChaseHeroScam.com."  That website includes posts alleging that Mr. Herro sought financial contributions for a business venture by claiming that his capital was "temporarily inaccessible" and promising substantial future returns.  But, according to the post, after the investors sent their money to Mr. Herro and asked for information about his spending practices and the venture's profits, he disappeared without returning their funds.

---

[10] John A. Jenkins, *"Dirtbag of the Internet" Hits a Crypto Gusher*, PoliScio Analytics (June 7, 2025), https://poliscio.com/dirtbag-of-the-internet-hits-a-crypto-gusher/.

COMPLAINT
Case No.

121.    Mr. Herro's pattern of questionable financial dealings extends to his personal taxes.  Mr. Herro is or has been subject to the following tax liens: (1) a $150,633 lien filed in January 2019 by the California Franchise Tax Board ("CFTB"); (2) a $131,210 lien filed in March 2018 by the CFTB; (3) a $79,512 lien filed by the IRS in October 2015; and (4) a $5,312 lien filed in November 2011 by the CFTB.  In addition, in October 2025, a notice of tax deed was issued on Mr. Herro's Boca Raton residence, indicating that the property would be sold at auction in January 2026 unless payments on unpaid taxes were made.

122.    And although Mr. Herro claimed in a Florida state court proceeding he initiated this January that he "is an individual residing in Boca Raton, Palm Beach County, Florida," Mr. Herro's driver's license lists his residence as a Puerto Rico address he sold in April 2022, suggesting that Mr. Herro is falsely claiming Puerto Rico residence to avoid paying his federal income tax obligations.  *See* Complaint ¶ 4, *Herro* v. *Biundo et al.*, 50-2026-CA-140 (Fla. 15th Cir. Ct. Jan. 6, 2026).

123.    Mr. Herro's lifelong pattern of fraud entered the crypto space in 2024, when he founded Dough Finance, a purported DeFi lending/borrowing protocol.  After raising substantial sums of money from investors, Dough Finance claimed that it had been the victim of a hack in which user assets were stolen.  Although Dough Finance claimed to have recovered and distributed a small fraction of the purportedly stolen assets, the vast majority of those funds are still missing.  Many have speculated that no hack in fact occurred, and that Mr. Herro and his colleagues at Dough—many of whom, including Mr. Folkman, Bogdan Purnavel, and Octavin Lojnita, subsequently joined him at World Liberty—absconded with the funds.

124.    For example, one X.com user (CtopherShea) commented: "Was this shit a scam/rug pull?  Crickets since August, can't even get my tokens off the site and onto my meta wallet."  Another user (Greg Nowacki) wrote: "Whatever happened to the distribution of the funds that were recovered?"  CtopherShea replied: "Hack was probably fake or an inside job. That money is most likely long gone alongside all the money they took from token buyers.  We all need to band together and file a law suit."

COMPLAINT
Case No.

125.   In January 2025, a Dough Finance investor did file such a suit.  In that action, plaintiff Jonathan Lopez alleged that Mr. Herro induced him to invest in Dough Finance by falsely claiming that the project had "guaranteed" liquidity and high returns, prompting Lopez to invest approximately $1 million.  *See Lopez* v. *Herro*, 25-cv-201405 (S.D. Fla.), Dkt. 42 (Amended Complaint).  Notably, Lopez claimed that the purported hack "was actually Chase personal[l]y liquidating and directing the platform's assets from Dough Finance" to "another wallet owned and/or controlled by Chase."  *Id.*  That action was voluntarily dismissed without prejudice after Lopez learned that Mr. Herro had represented in a court filing in the *Biundo* action that his residence was in Boca Raton—notwithstanding Mr. Herro's prior claims that he lived in Puerto Rico—thus removing the court's diversity jurisdiction.  *See id.* Dkt. 55 (Notice of Voluntary Dismissal Without Prejudice).

126.   Mr. Herro has been sued on other occasions as well, including for fraud in 2010, when he allegedly used a $170,000 investment in a purported medical marijuana company "for his own personal benefit."  Mr. Herro was ordered to pay $207,366 in damages, interest, and other costs in that matter.

**L.   World Liberty Has Caused Plaintiffs Both Economic And Noneconomic Harm.**

127.   World Liberty's unlawful actions have deprived Plaintiffs of important economic and governance rights conferred by their token ownership.  But for World Liberty's first unlawful freezing, Plaintiffs could have sold up to 600 million of their tokens for approximately $276 million, and Plaintiffs will be unable to realize any economic value from their tokens— which have at times been valued at $1 billion or more—as long as the tokens are unlawfully frozen.

128.   In addition, World Liberty has wrongly deprived Plaintiffs of material governance rights that attach to the tokens.  World Liberty's gold paper provides that (1) "[t]he sole utility of holding $WLFI is governance of the WLF Protocol"; (2) "$WLFI tokens represent a right to vote on certain WLF Protocol matters"; (3) votes submitted by $WLFI token holders "help guide the WLF Protocol by approving new proposals that set forth new parameters and strategic decisions regarding the WLF Protocol"; and (4) "$WLFI token holders can participate in WLF Protocol

35

COMPLAINT
Case No.

governance and help shape the future of stablecoin and decentralized finance projects that support the US Dollar remaining the global reserve currency."

129. World Liberty has unlawfully disabled the governance function of three billion of Plaintiffs' tokens. Until that function is restored, Plaintiffs will be deprived of important voting rights on governance proposals that could substantially affect their interests.

130. In fact, on April 15, 2026, World Liberty posted in the company's online forum a governance proposal to set a vesting schedule for (1) the 80% of early purchaser tokens that were not covered by the July 2025 governance vote and (2) the tokens issued to founders and advisors. A week-long voting period to approve that proposal could begin at any time.

131. Plaintiffs hold 3.4 billion tokens across both categories. Plaintiffs thus have substantial interests in the terms and timing under which additional tokens are unlocked.

132. Among other things, the proposal provides that $WLFI in category (1), including 2.4 billion of Plaintiffs' tokens, will remain locked for a two-year period followed by a two-year vesting schedule, "with tokens beginning to unlock at year 2 and fully distributed by year 4." If the proposal passes, "[h]olders who do not affirmatively accept this new vesting schedule will continue to have their tokens locked indefinitely."

133. For $WLFI in category (2), including Plaintiffs' one billion advisor tokens, holders will "have the option to elect less favorable unlock terms or remain locked indefinitely." Specifically, "[i]f all founders, team members, advisors, and partners opt in:

- 10% of the total locked token allocation—4,523,858,565 WLFI—is permanently burned and removed from total supply immediately upon proposal passage.

- The remaining 90%—40,714,727,082 WLFI—is placed on a 2-year cliff followed by a 3-year linear vest, with tokens beginning to unlock at year 2 and fully distributed by year 5.

Although the proposal provides that if "a founder, team member, advisor, and partner does not affirmatively accept this new vesting schedule, their tokens will not be burned," they "will continue to have their tokens locked indefinitely." In other words, if Plaintiffs do not agree to have 100 million of their advisor tokens burned, all one billion of those tokens will be locked indefinitely, with no viable path to tradability.

134.    Plaintiffs obviously have substantial interests in voting on this proposal—and their voting power is significant.  They own four billion tokens total.  Of the six governance votes submitted to $WLFI token holders to date, the highest number of votes cast on any proposal was 11.1 billion tokens, and the lowest was 2.7 billion tokens.  To be sure, Plaintiffs are subject to a restriction capping their voting power at 5% of the votable token supply, but all other token holders are subject to the same restriction, and World Liberty's website indicates that the limitation applies in practice only once a token holder owns more than five billion tokens.

135.    Immediate injunctive relief is therefore necessary to protect Plaintiffs' property from being impaired by an imminent governance vote from which World Liberty will arbitrarily exclude them and that could result in the burning of 100 million of their tokens.

**M.    World Liberty's Recent Staking Proposal Further Injured Plaintiffs.**

136.    Indeed, World Liberty utilized its illegal disenfranchisement of Plaintiffs to deprive them of their say on another significant governance reform last month.

137.    On March 5, 2026, World Liberty staged a vote to approve a governance proposal titled "WLFI Governance Staking System" (the "Staking Proposal"), which proposed that $WLFI token holders "stake" their unlocked early investor tokens—which would lock them from trading—for 180 days as a prerequisite for voting those tokens on future governance proposals.  Under the Staking Proposal, token holders who stake their unlocked tokens and participate in at least two governance votes will earn a yield of approximately 2%, payable in additional $WLFI tokens.  The Staking Proposal also created tiered categories of token holders based on the quantity of tokens staked, with holders staking 50 million or more tokens designated "Super Nodes" entitled to, among other privileges, "guaranteed direct access" to the World Liberty team for "partnership discussions."

138.    On March 12, 2026, the Staking Proposal was approved by a vote of $WLFI token holders, with the company reporting that approximately 2.7 billion tokens, over 99% of the votes cast—but fewer than Plaintiffs' three billion unlawfully disenfranchised tokens—were in favor of the proposal.  Due to World Liberty's unlawful denial of Plaintiffs' voting rights, Plaintiffs were

unable to vote on this critically important proposal—a proposal that directly and materially affects their economic and governance interests as one of the largest $WLFI token holders.

139.    In addition to being denied the right to vote on the Staking Proposal, Plaintiffs have been denied the ability to stake their tokens and thereby earn income from the 2% staking yield, compounding the economic harm caused by World Liberty's unlawful freezing of Plaintiffs' tokens.  Given the size of Plaintiffs' holdings, the staking yield represents a significant source of potential income that Plaintiffs would have been entitled to earn but for World Liberty's misconduct.

140.    Moreover, the Staking Proposal likely constituted an illegal vote because Plaintiffs, who have one of the single largest $WLFI positions, were improperly barred from participating.  Plaintiffs' exclusion from a vote of this magnitude—one that restructures the very framework through which future governance decisions will be made—compounded Plaintiffs' injuries.  And, by disenfranchising a major stakeholder, World Liberty undercut the vote's very legitimacy.

### N.    World Liberty Is On The Verge Of Collapse.

141.    World Liberty announced that it would use $WLFI token sale proceeds to operate its business.  The TPA explained that the net sale proceeds would be "paid to developer and service providers to the Company, after deducting a portion to initially be held by the treasury to address initial and ongoing WLF Protocol expenses."  Uses of the net proceeds held in the treasury would be "at the discretion of the Company, and may include compensating employees and contractors, and for other internal purposes in connection with the deployment and the development of the WLF Protocol, supply of liquidity to the WLF Protocol, or purposes deemed necessary by the Company for the operation of the WLF Protocol."

142.    Apparently the business World Liberty planned to operate included paying most of the token sale proceeds—up to 95%—to company insiders.[11]   At that rate, World Liberty

---

[11] Tom Wilson et al., *Insight: How the Trump family took over a crypto firm as it raised hundreds of millions*, Reuters (Mar. 31, 2025) (noting that World Liberty's co-founders are entitled to up to 95% of the proceeds from the token sales, and that after those individuals "take their cut, the crypto venture will be left with 5% of the $550 million raised to date to build the platform").

retained just 5% of the approximately $550 million it raised, or $27.5 million.[12]  That figure is dwarfed by the current market value of Plaintiffs' four billion tokens, which comes to $318,360,000—which is more than 11 times $27.5 million.  Plaintiffs thus have grave concerns about World Liberty's ability to pay eventual damages if the company destroys Plaintiffs' tokens.

143.    World Liberty's recent actions only heighten those concerns by indicating that the company is on the brink of collapse and potential insolvency.  Public information shows that World Liberty faces severe financial pressure that creates a substantial risk of default on its obligations.

144.    Perhaps most alarming, World Liberty has recently undertaken a series of transactions involving circular borrowing arrangements with a related-party lending platform that analysts have warned parallels actions taken by the ill-fated FTX entities before their collapse and bankruptcy in 2022—one of the largest financial frauds in history, resulting in federal criminal prosecutions, convictions, and the bankruptcy of numerous affiliated entities.[13]  At the same time the market grapples with the revelation that World Liberty can freeze wallets and effectively control token liquidity, the company has reportedly deployed significant amounts of its own $WLFI tokens as collateral to borrow stablecoins on a platform co-founded by a company insider. This suspicious borrowing activity suggests a concerted effort by World Liberty to monetize its $WLFI tokens before the anticipated investor token unlock drives the price down further.

145.    According to media reports first published on April 9, 2026, on-chain data reveals that as of April 7, 2026, World Liberty had deposited approximately five billion of its own $WLFI tokens—nearly half of the company's treasury tokens and approximately 5% of the total $WLFI supply—as collateral on the lending platform Dolomite, which was co-founded by World Liberty's advisor and Chief Technology Officer, Corey Caplan.[14]  The overlapping management

---

[12] *Id.*

[13] *See*, *e.g.*, Kyle Torpey, *Trump's World Liberty Financial Makes FTX-esque Move, Borrows Against Its Own Crypto Token*, Gizmodo (Apr. 11, 2026), https://gizmodo.com/trumps-world-liberty-financial-makes-ftx-esque-move-borrows-against-its-own-crypto-token-2000745326/.

[14] Amin Haqshanas, *Trump-linked WLFI hits new low as token-backed loan triggers concern*, Coin Telegraph (Apr. 11, 2026), https://cointelegraph.com/news/trump-linked-wlfi-hits-new-low-token-backed-loan-concerns/.

COMPLAINT
Case No.

between World Liberty and Dolomite is significant.  Through its control over a co-founder of Dolomite, World Liberty was able to exercise dominion over the platform to have it accept World Liberty's own illiquid $WLFI tokens as collateral to borrow dollar-backed stablecoins, effectively enabling World Liberty to exchange tokens it created out of thin air for real money put up by consumers hoping to finance DeFi loans.  World Liberty reportedly pledged these tokens to borrow at least $75 million in stablecoins, including USD1—World Liberty's own U.S.-dollar-pegged stablecoin.[15]

146.    World Liberty has thus used internally generated and illiquid assets to obtain external liquidity.  Of the borrowed stablecoins, more than $40 million worth was reportedly transferred by World Liberty to Coinbase Prime, a platform commonly used for institutional fiat conversion.[16]   This move suggests that World Liberty converted borrowed tokens into fiat currency available for off-platform uses.

147.    The timing and scale of these borrowing activities strongly indicate that World Liberty is attempting to monetize its $WLFI tokens—which have already declined by more than 80% from their peak price—before the imminent vote to set an investor token unlock schedule. The unlocking of additional tokens is widely expected to depress $WLFI prices by greatly increasing supply without any corresponding increase in demand.  By borrowing against $WLFI now—and converting the proceeds to fiat through Coinbase Prime—World Liberty appears to be trying to extract whatever value it can from its token holdings before prices fall even further.

148.    World Liberty's borrowing has had direct and material consequences for USD1 liquidity.  USD1 holders that have deposited their tokens into Dolomite's lending pool, which is World Liberty's central "liquidity pool," expect to earn yield by doing so.[17]   In the immediate

---

[15] *Id.*

[16] *Justin Sun Accuses World Liberty Financial of Hidden Token Freeze Backdoor Amid $175M Dispute*, CoinMarketCap (Apr. 12, 2026), https://coinmarketcap.com/community/articles/69dc25207249cc495161d9d7/.

[17] Liam Turner, *World Liberty Markets Goes Live as USD1 Enters DeFi Lending With $3B Supply and Dolomite Liquidity*, Crypto Ninjas (Jan. 13, 2026), https://www.cryptoninjas.net/news/world-liberty-markets-goes-live-as-usd1-enters-defi-lending-with-3b-supply-and-dolomite-liquidity/.

COMPLAINT
Case No.

aftermath of World Liberty's scheme, that lending pool had an approximately 93% utilization ratio, meaning that $167.5 million worth of the pool's USD1 had been borrowed against a total supply of $180 million.[18]  Because of that "extreme utilization, ordinary retail depositors who lent their stablecoins to the pool, expecting to withdraw at will, are now unable to access their funds.  Their capital is effectively locked until the WLFI team decides to repay its massive debt."[19]  In other words, many ordinary depositors of USD1 are unable to withdraw their assets because World Liberty's borrowing consumed nearly all of Dolomite's USD1 liquidity.[20]

149.    To entice USD1 deposits, Dolomite artificially inflated the pool's lending rates to yields as high as 35%.  Analysts have identified these elevated rates not as a sign of organic market demand, but as a symptom of a liquidity crisis created by a single borrower consuming nearly the entire pool.  As one prominent DeFi analyst observed: "You're earning yield you can't withdraw on principal you can't access.  That 35% wasn't compensation for a risk you understood.  It was a price tag for a risk nobody explained to you."[21]  These conditions bear the storm warnings of a traditional bank run scenario, in which USD1 withdrawal requests cannot be satisfied because available liquid assets have been exhausted.

150.    World Liberty's borrowing creates a dangerous risk for $WLFI holders as well.  In addition to reflecting an apparent effort by World Liberty to monetize illiquid $WLFI at the expense of other holders whose tokens are locked up, the company's pledge of $WLFI as collateral has the potential to trigger a cascading price crash for a token that is already shedding value.  According to one analyst, if $WLFI declines significantly in value, World Liberty's collateral could be liquidated, which would likely force World Liberty to sell WLFI tokens to

---

[18] Shaurya Malwa, *Trump's World Liberty Financial uses 5 billion WLFI to borrow $75 million from a platform its adviser co-founded*, CoinDesk (Apr. 9, 2026), https://www.coindesk.com/markets/2026/04/09/trump-s-world-liberty-financial-borrows-usd75-million-against-its-own-token-trapping-depositors-on-dolomite/.

[19] Oluwapelumi Adejumo, *Trump's World Liberty Financial borrows $75M against illiquid WLFI tokens with 16B token dump incoming*, CryptoSlate (Apr. 10, 2026), https://cryptoslate.com/trumps-world-liberty-financial-borrows-75m-against-illiquid-wlfi-tokens-with-16b-token-dump-incoming/.

[20] *Id.*

[21] *Id.*

repay the loan, exerting additional downward pressure on the token's price.[22]　The currently thin market liquidity for $WLFI means that any forced selling from liquidations could trigger a cascading price crash that further impairs collateral values.

151.　The market reaction to these disclosures has been immediate and adverse.　The price of $WLFI fell to a record low—dropping to approximately $0.077, a roughly 83% decline from its all-time high—on April 11, 2026, two days after the company's Dolomite borrowing activity was widely reported.[23]

152.　Industry analysts have drawn direct comparisons between World Liberty's borrowing and the collapse of the FTX crypto exchange in 2022—arising from one of the largest financial frauds in U.S. history—where FTX entities borrowed vast amounts of stablecoins against their own FTT token, creating massive self-referential leverage that ultimately led to FTX's bankruptcy and criminal fraud prosecutions of FTX's founders.[24]　Some have warned that World Liberty's borrowing similarly resembles "creating artificial chips"—a system built on self-referential and potentially illiquid assets that creates grave liquidation risk if token prices continue to decline.[25]

153.　The threat of a decline in $WLFI's market price could also leave World Liberty desperate to stave off liquidation by pledging more tokens to cover a collateral shortfall.　World Liberty could thus exhaust its treasury token supply and seek additional $WLFI from other sources—including Plaintiffs—using the smart contract's reallocation function.　Indeed, when Plaintiffs connected the wallet designated for their three billion early purchaser tokens to World Liberty's vesting smart contract, that contract returned just 600 million unlocked tokens to Plaintiffs.　The balance—Plaintiffs' 2.4 billion locked early purchaser tokens—are still held by

---

[22] Jack Kubinec, *Trump-backed World Liberty Financial tokens hit all-time low on reports of insider loans*, Fortune (Apr. 10, 2026), https://fortune.com/2026/04/10/trump-world-liberty-financial-crypto-tokens-insider-loans/.

[23] Haqshanas, *Trump-linked WLFI hits new low as token-backed loan triggers concern*, *supra* note 14.

[24] Adejumo, *Trump's World Liberty Financial borrows $75M against illiquid WLFI tokens with 16B token dump incoming*, *supra* note 19.

[25] *Id.*

the vesting contract, meaning World Liberty has the power to confiscate those tokens at any time without obtaining Plaintiffs' consent or providing them with any notice.

154. World Liberty's response to public misgivings about the company's future has only exacerbated those concerns. The company has surprisingly issued new stablecoins, minting approximately $25 million worth of USD1 while simultaneously burning $3 million worth, resulting in a net increase of $22 million in circulating supply.[26]

155. Following public scrutiny of its borrowing activities, World Liberty repaid a portion of its outstanding stablecoin loans on Dolomite. But its minting of new USD1 closely tracked the timeline of its loan repayments, raising questions as to whether World Liberty is effectively creating new tokens to service existing obligations without the reserves to back up those new tokens.[27] Reporting further indicates that World Liberty controls both the issuance and destruction of its stablecoin, meaning it has unilateral authority to expand or contract supply without transparent disclosure of underlying reserves.[28]

156. Indeed, even before World Liberty's circular borrowing came to light, the integrity of USD1 was called into question. In February 2026, USD1 briefly lost its 1:1 peg to the U.S. dollar, dropping approximately 0.6% below its $1 target.[29] Because a dollar-denominated stablecoin's entire utility—and hence, its fundamental value—depends on its ability to maintain a fixed one-to-one peg to the U.S. dollar, even a brief de-peg signals that the market has lost confidence in the adequacy or liquidity of the reserves backing USD1. For USD1, this de-peg event is particularly alarming in light of World Liberty's subsequent borrowing and minting

---

[26] Shaurya Malwa, *World Liberty Financial executes a massive $22 million stablecoin shuffle amid its borrowing controversy*, CoinDesk (Apr. 13, 2026), https://www.coindesk.com/markets/2026/04/13/wlfi-mints-usd25-million-in-fresh-usd1-and-burns-usd3-million-days-after-repayment-claim/.

[27] *Id.*

[28] *Id.*

[29] Krisztian Sandor, *Trump-linked stablecoin wobbles as WLFI says it's under 'coordinated attack'*, CoinDesk (Feb. 23, 2026), https://www.coindesk.com/markets/2026/02/23/trump-linked-stablecoin-wobbles-as-wlfi-says-it-s-under-coordinated-attack.

COMPLAINT
Case No.

activities, which call into question whether the company holds sufficient independent reserves to honor USD1 redemptions on demand.

157.    All of these developments signal distress in World Liberty's ecosystem.  World Liberty's collateral is rapidly deteriorating, its governance credibility has been undermined, and market confidence in the company is eroding.  These are the conditions under which financial institutions enter a self-reinforcing downward cycle where liquidity pressures and a loss of confidence accelerate one another.  Absent a swift and substantial amelioration of these conditions, World Liberty will very likely soon be unable to pay its debts.

158.    That reality reinforces the need for interim injunctive relief from this Court to prevent World Liberty from burning Plaintiffs' tokens, as World Liberty almost certainly will not have sufficient assets to compensate Plaintiffs for the value of their four billion tokens if the tokens are destroyed.

### FIRST CAUSE OF ACTION

### (Breach of Contract – Delaware Law)

159.    Plaintiffs incorporate by reference each and every allegation set forth above.

160.    The TPA ███████ are binding contracts between Plaintiffs and World Liberty.

161.    Under the TPA, Plaintiffs agreed to purchase two billion $WLFI tokens from World Liberty in exchange for consideration totaling $30 million and were awarded an additional grant of one billion $WLFI tokens.  Plaintiffs then purchased an additional one billion $WLFI tokens for $15 million in another transaction.

162.    The TPA expressly provided that "[u]pon the Delivery in accordance with the provisions of this Agreement, [Plaintiffs] will acquire valid marketable title to the Purchased Tokens, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest other than as set forth herein."  World Liberty breached that provision of the TPA by freezing Plaintiffs' tokens prior to the September 1, 2025 unlock date, and it breached that provision again by freezing them a second time thereafter.

163.    The TPA further provided that "[i]f transferability of $WLFI is sought to be unlocked in the future through protocol governance procedures, such unlock would only be

permitted if determined not to contravene applicable law," and that "[t]o [World Liberty's] knowledge, [World Liberty's] sale of Tokens complies with all applicable laws and regulations in [World Liberty's] jurisdiction, and the law and regulation of any jurisdiction to which [World Liberty] may be subject." World Liberty breached that provision of the TPA by giving itself centralized control over the tokens, including the capacity to freeze and reallocate tokens, without satisfying applicable legal requirements.

164. World Liberty also breached the TPA in another way. When it unlawfully disabled the governance function of all three billion of Plaintiffs' purchased tokens without a legitimate basis, World Liberty breached the TPA's promises that Plaintiffs would "have the power to propose and vote on proposals that will help to shape the future of the World Liberty Financial Protocol," and that "[a]ll $WLFI" would "have equal voting power within the WLF Protocol."

165. After breaching the TPA by freezing Plaintiffs' tokens, █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████. Although World Liberty offered supposed justifications for doing so, those reasons were pretextual and demonstrably false.

166. World Liberty's material breaches of its contractual commitments have caused, and will continue to cause, substantial injury to Plaintiffs, including but not limited to the loss of economic value of their frozen tokens, loss of governance and voting rights, and loss of staking income.

## SECOND CAUSE OF ACTION

### (Anticipatory Breach of Contract – Delaware Law)

167. Plaintiffs incorporate by reference each and every allegation set forth above.

168. World Liberty has threatened to burn Plaintiffs' $WLFI tokens without compensation. World Liberty co-founder Chase Herro expressly threatened to burn Plaintiffs' tokens, and World Liberty has ensured it has the technical capability to carry out that threat by implementing smart contract upgrades giving it the power to reallocate and destroy any user's tokens at will.

169. Burning Plaintiffs' tokens would constitute a material breach of the TPA ██ ███.

170. Under the TPA, World Liberty was obligated to provide, among other things, "valid marketable title to the Purchased Tokens, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest other than as set forth herein." Burning the tokens would permanently deprive Plaintiffs of title to the tokens by destroying the tokens themselves, and World Liberty's power to burn tokens is nowhere set forth in the TPA. In addition, the TPA stated that token holders would "have the power to propose and vote on proposals that will help to shape the future of the World Liberty Financial Protocol," and that "[a]ll $WLFI will have equal voting power within the WLF Protocol." Burning Plaintiffs' tokens would breach those obligations by permanently denying Plaintiffs' ability to vote any of their tokens.

171. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

172. World Liberty's threatened burning of Plaintiffs' tokens constitutes an anticipatory breach of both the TPA ████████ Plaintiffs are entitled to a declaratory judgment that World Liberty is not permitted to burn their tokens, which are unquestionably Plaintiffs' property, and to

COMPLAINT
Case No.

equitable relief prohibiting World Liberty from burning, destroying, or otherwise rendering inaccessible any of Plaintiffs' $WLFI tokens.

### THIRD CAUSE OF ACTION

**(Fraud in the Inducement – Delaware Law)**

173. Plaintiffs incorporate by reference each and every allegation set forth above.

174. In selling $WLFI tokens to Plaintiffs, World Liberty made numerous material misrepresentations and omissions of fact, including but not limited to misrepresenting in the gold paper that (a) World Liberty would operate a decentralized digital-asset platform to promote "freedom to transact" and "without intermediaries" based "on American ideals of liberty, privacy, and freedom to transact"; (b) $WLFI token holders would be empowered to vote on protocol upgrades and other governance matters; and (c) that World Liberty would comply with applicable laws. These misrepresentations and omissions were designed to induce Plaintiffs to enter into the TPA and invest in World Liberty.

175. World Liberty's misrepresentations and omissions were material because they concerned the fundamental characteristics and risks of the $WLFI tokens, including World Liberty's development and implementation of technical capabilities affecting the tokens' functionality.

176. World Liberty knew these representations were false when made, or made them with reckless disregard for their truth or falsity. World Liberty's conduct shows as much. It upgraded the $WLFI smart contract to include blacklisting and reallocation functions contrary to its marketing of the tokens as free from centralized control and its continuing representations in the TPA.

177. Plaintiffs justifiably relied on World Liberty's misrepresentations and omissions in the gold paper, marketing materials, and elsewhere in deciding to acquire $WLFI tokens. If World Liberty had revealed the possibility that it would develop and weaponize secret blacklisting powers and violate the law, Plaintiffs would never have entered into the TPA, acquired $WLFI tokens, or publicly endorsed the World Liberty project.

178.    As a direct and proximate result of World Liberty's fraud, Plaintiffs have suffered damages, including but not limited to the loss of the economic value of their frozen tokens, which have at times been valued in excess of $1 billion, and the loss of governance rights attaching to those tokens.

### FOURTH CAUSE OF ACTION

### (Conversion – Delaware Law)

179.    Plaintiffs incorporate by reference each and every allegation set forth above.

180.    As owners of the frozen $WLFI tokens, Plaintiffs have valid property and possessory interests in the tokens.

181.    Despite these valid interests, World Liberty improperly froze Plaintiffs' tokens, making Plaintiffs unable to transfer, trade, stake, or vote their tokens—even between wallets they control—amounting to an effective seizure of Plaintiffs' property.

182.    World Liberty has refused to unfreeze or return Plaintiffs' tokens ███████ ███████████████████████████████████████████████████ ██████████████████████████████████.

183.    World Liberty's conversion has been further compounded by the company's November 2025 smart contract upgrade, which gave World Liberty the unilateral power to reallocate—and thus permanently seize or destroy—Plaintiffs' $WLFI tokens at will.

184.    As a result of World Liberty's conversion of Plaintiffs' property, Plaintiffs have suffered substantial damages.

### FIFTH CAUSE OF ACTION

### (Unjust Enrichment – Delaware Law)

185.    Plaintiffs incorporate by reference each and every allegation set forth above.

186.    In the alternative to Plaintiffs' breach of contract claims, World Liberty was unjustly enriched.  Plaintiffs paid World Liberty $45 million to purchase $WLFI tokens.  World Liberty accepted and retained that consideration.

187.    World Liberty has unjustly retained the benefits of Plaintiffs' $45 million investment while depriving Plaintiffs of the ability to realize any economic value from their

tokens through World Liberty's unlawful freezing, blacklisting, and threatened destruction of Plaintiffs' tokens.  World Liberty has thus left Plaintiffs holding tokens that they cannot sell, transfer, vote, or stake, rendering their investment effectively worthless.

188.   It would be unjust and inequitable for World Liberty to retain the benefits of Plaintiffs' investment without providing Plaintiffs the consideration for which they bargained. Plaintiffs are entitled to restitution of their investment and/or rescission of the transactions.

## SIXTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing – Delaware Law)

189.   Plaintiffs incorporate by reference each and every allegation set forth above.

190.   The TPA ██████ contain an implied covenant of good faith and fair dealing under Delaware law, requiring that neither party take actions that would deprive the other of the fruits of the bargain.

191.   World Liberty breached the implied covenant of good faith and fair dealing by, among other things, secretly implementing blacklisting and reallocation functions that neither the TPA ██████ contemplated or authorized, and by using those undisclosed capabilities to freeze, restrict, and threaten to destroy Plaintiffs' tokens.  Plaintiffs had no reason to believe that such blacklisting functionality would exist, and were taken by surprise by powers that were never contemplated by the parties at the time they entered into the TPA.

192.   As a direct and proximate result of World Liberty's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered substantial damages.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief)

193.   Plaintiffs incorporate by reference each and every allegation set forth above.

194.   An actual controversy exists between Plaintiffs and World Liberty concerning their respective rights and obligations under the parties' agreements, including but not limited to the TPA ██████.

195.   Plaintiffs are entitled to a judicial declaration that World Liberty: (i) materially breached the TPA's representations and warranties, including those regarding marketable title and

49
COMPLAINT
Case No.

the accuracy of information provided to Plaintiffs, by singling out and freezing Plaintiffs' tokens; (ii) materially breached the TPA ▮▮▮▮▮▮ when it unlawfully refroze Plaintiffs' tokens and suspended the governance function of Plaintiffs' tokens; (iii) materially breached the TPA when it disabled the voting function of three billion of Plaintiffs' tokens; and (iv) proceeded with improper governance votes, including the vote on the Staking Proposal, while the governance function of Plaintiffs' tokens was unlawfully suspended.

196.    A judicial declaration is necessary and appropriate to resolve the parties' dispute and guide their future conduct, including with respect to any and all future governance votes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief from this Honorable Court:

A.    Enter judgment in favor of Plaintiffs against Defendant.

B.    Order Defendant to unfreeze the $WLFI tokens that Plaintiffs purchased from Defendant and award Plaintiffs damages in an amount to be determined at trial.

C. Award Plaintiffs interim and permanent injunctive relief, including orders restraining World Liberty from seizing, burning, destroying, or encumbering any of Plaintiffs' $WLFI tokens.

D.  Enter a declaratory judgment that World Liberty is not permitted to burn, destroy, or otherwise render permanently inaccessible any of Plaintiffs' $WLFI tokens, and that World Liberty (i) materially breached the TPA's representations and warranties, including those regarding marketable title and the accuracy of information provided to Plaintiffs, by singling out and freezing Plaintiffs' tokens; (ii) materially breached the TPA ▮▮▮▮▮▮ when it unlawfully refroze Plaintiffs' tokens and suspended the governance function of Plaintiffs' tokens; (iii) materially breached the TPA when it disabled the voting function of three billion of Plaintiffs' tokens; and (iv) proceeded with improper governance votes, including the vote on the Staking Proposal, while the governance function of Plaintiffs' tokens was unlawfully suspended.

E.  Award Plaintiffs restitution and/or rescission in the alternative to breach of contract damages.

F. Award Plaintiffs all expenses incurred as a result of the dispute in this matter including

COMPLAINT
Case No.

all reasonable attorneys' fees and costs.

## TRIAL DEMANDED

Plaintiffs respectfully request a trial in this action of all issues so triable.

Dated: April 21, 2026                                    KEKER, VAN NEST & PETERS LLP


By:   */s/ Robert A. Van Nest*
      ROBERT A. VAN NEST
      STEVEN P. RAGLAND
      BROOK DOOLEY
      GAYATRI V. PARANJAPE


      CAHILL GORDON & REINDEL LLP
      SAMSON A. ENZER (*PHV Pending*)
      HERBERT S. WASHER (*PHV Pending*)
      EDWARD N. MOSS (*PHV Pending*)
      JOHN S. MACGREGOR

      CAHILL GORDON & REINDEL LLP
      GREGORY STRONG (*PHV Pending*)

      Attorneys for Plaintiffs YUCHEN
      "JUSTIN" SUN, BLUE ANTHEM
      LIMITED, and BLACK ANTHEM
      LIMITED

51
COMPLAINT
Case No.